FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2022 JUL 14  P 3: 50  *cc*

CAROL L. MICHEL
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**



# FELONY

**INDICTMENT FOR**
**CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD,**
**HEALTH CARE FRAUD, CONSPIRACY TO PAY AND RECEIVE**
**KICKBACKS, OFFERING AND PAYING KICKBACKS, CONSPIRACY TO**
**COMMIT MONEY LAUNDERING, AND MONEY LAUNDERING**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO:** 22-151 |
| **v.** | * | **SECTION:** SECT. 1 MAG. 5 |
| **JAMIE P. MCNAMARA** | * | **VIOLATIONS:** |
| | | 18 U.S.C. § 1349 |
| | * | 18 U.S.C. § 1347 |
| | | 18 U.S.C. § 371 |
| | * | 42 U.S.C. § 1320a-7b(b)(2) |
| | | 18 U.S.C. § 1956(h) |
| | * | 18 U.S.C. § 1956(a)(1)(B)(i) |
| | | 18 U.S.C. § 1957(a) |
| | * | 18 U.S.C. § 2 |

\*       \*       \*

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material herein:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or

___Fee_____
___Process_____
_X_Dktd_____
___CtRmDep_____
___Doc.No._____

disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits and was separated into different program "parts," including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covered outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, when certain criteria were met.

4.      Medicare "providers" included physicians, independent clinical laboratories, and other health care providers who provided services to beneficiaries. To bill Medicare, a provider was required to submit a Provider Enrollment Application to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5.      Additionally, when initially enrolling or updating ownership or management information, the Provider Enrollment Application required that the provider disclose all owners and any individuals or businesses with managing control over the provider. This disclosure

2

requirement included any individual or entity with five percent or more ownership, managing control, or partnership interest regardless of the percentage of ownership the partner had.

6.     This disclosure requirement was necessary, in part, because CMS could deny a provider's enrollment in Medicare, among other reasons, if the "provider, supplier, or any owner or managing employee of the provider or supplier was, within the preceding 10 years, convicted . . . of a Federal or State felony offense that CMS determines is detrimental to the best interests of the Medicare program and its beneficiaries." 42 C.F.R. § 424.530.

7.     A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application.  A provider that obtained a Medicare provider number was able to file claims with Medicare to obtain reimbursement for benefits, items, or services rendered to beneficiaries.

8.     When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").

9.     When submitting claims to Medicare for reimbursement, providers certified that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, were medically necessary.

10.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing

3

Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

11.     Medicare would not reimburse providers for claims that were not medically necessary or were procured through the payment of kickbacks and bribes.

**Medicare Coverage of Genetic Testing**

12.     Cancer genetic testing ("CGx testing") used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

13.     Genetic testing for cardiovascular disease ("cardio genetic testing") used DNA sequencing to detect mutations in genes that could indicate an increased risk of developing serious cardiovascular conditions in the future and could assist in the treatment or management of a patient who presently had signs or symptoms of a cardiovascular condition.  Cardio genetic testing was not a method of diagnosing whether an individual presently had a cardiac condition.

14.     For both CGx testing and cardio genetic testing (collectively, "genetic testing"), the patient provided a saliva sample or cheek or nasal swab containing DNA material.  Tests could then be run on different "panels" of genes.  Genetic testing typically involved multiple lab procedures that could result in billing Medicare using certain billing codes, each with their own reimbursement rate.

15.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury."  42 C.F.R. § 411.15(a)(1).

16.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### Telemedicine

17.     Telemedicine was a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

18.     Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

19.     Medicare Part B covered expenses for specific telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a provider's office or a specified medical facility—not at the beneficiary's home—during the telehealth service with a remote provider. In or around March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural or health

professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

## The Defendant and Relevant Individuals and Entities

20.     LPS Toxicology Laboratories, L.L.C., doing business as Clarity Diagnostic Laboratories LLC ("CLARITY"), was a Louisiana limited liability company with a principal place of business in Orleans Parish, Louisiana.   CLARITY was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries.   CLARITY held an account at Bank 1 ending in x3336 ("Clarity Account").

21.     S&A Sleep Solutions, LP, doing business as Mercury Laboratory Services ("MERCURY"), was a Texas limited partnership with a principal place of business in Harris County, Texas.  MERCURY was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries. MERCURY held an account at Bank 2 ending in x5382 ("Mercury Account 1") and an account at Bank 3 ending in x6400 ("Mercury Account 2").

22.     Opteo Laboratory, LLC ("OPTEO") was a Louisiana limited liability company with a principal place of business in Orleans Parish, Louisiana.  OPTEO was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries.  OPTEO held accounts at Bank 2 ending in x3802 ("Opteo Account 1") and x1656 ("Opteo Account 2").

23.     Signify Laboratory, LLC ("SIGNIFY") was a Louisiana limited liability company with a principal place of business in Orleans Parish, Louisiana.  SIGNIFY was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to

individuals, including Medicare beneficiaries. SIGNIFY held an account at Bank 2 ending in x9393 ("Signify Account").

24.     Beyond Medical LLC ("BEYOND MEDICAL") was a Missouri limited liability company that operated as a purported marketing company. BEYOND MEDICAL held an account at Bank 4 ending in x7733 ("Beyond Medical Account").

25.     Blue Horizon Consulting, LLC ("BLUE HORIZON") was a Missouri limited liability company that operated as a purported marketing company. BLUE HORIZON held accounts at Bank 5 ending in x5663 ("Blue Horizon Account 1"), at Bank 6 ending in x3830 ("Blue Horizon Account 2") and x0502 ("Blue Horizon Account 3"), and at Bank 7 ending in x9619 ("Blue Horizon Account 4").

26.     Bluebird Advisors, LLC ("BLUEBIRD ADVISORS") was a Missouri limited liability company that held an account at Bank 2 ending in x8761 ("Bluebird Account").

27.     Telemedicine Company 1 was a Florida limited liability company that purported to provide telemedicine services.

28.     Call Center 1 was a Florida limited liability company that purported to provide call center operations.

29.     Call Center 2 was a Florida limited liability company that purported to provide call center operations.

30.     Defendant **Jamie P. McNamara** ("MCNAMARA") was a resident of Missouri. **MCNAMARA** was a beneficial owner of CLARITY, MERCURY, OPTEO, and SIGNIFY (collectively, the "MCNAMARA LABS"), as well as BEYOND MEDICAL and BLUE HORIZON. **MCNAMARA** was a signatory on Mercury Account 1, Opteo Account 1, Signify

Account, Beyond Medical Account, Blue Horizon Account 1, Blue Horizon Account 2, and Bluebird Account.

31.     Co-conspirator 1 was a resident of Louisiana.  Co-conspirator 1 was a beneficial owner and operator of the MCNAMARA LABS and a signatory on Mercury Account 1, Opteo Account 1, and Signify Account.

32.     Individual 1 was a resident of Missouri.  Individual 1 was a signatory on Beyond Medical Account, Blue Horizon Account 1, and Blue Horizon Account 2.

33.     Individual 2 was a resident of Missouri.  Individual 2 was a signatory on Opteo Account 1, Signify Account, and Blue Horizon Account 2.

34.     Individual 3 was a resident of Kansas.  Individual 3 was a signatory on Opteo Account 1, Opteo Account 2, and Signify Account.

**COUNT 1**
(Conspiracy to Commit Health Care Fraud and Wire Fraud)

**A.     AT ALL TIMES RELEVANT:**

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

**B.     THE CONSPIRACY:**

1.     Beginning in or around November 2018, and continuing through in or around July 2020, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA**, did knowingly and willfully conspire and agree with Co-conspirator 1 and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b),

8

that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

   b. to devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## B. <u>PURPOSE OF THE CONSPIRACY</u>:

   It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things:

   1. offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for genetic testing, along with other documentation necessary to submit claims to Medicare (collectively, "doctors' orders"), without regard to medical necessity of the prescribed genetic testing;

   2. paying kickbacks and bribes to purported marketers, call centers, telemedicine companies, and others, in exchange for ordering and arranging for the ordering of genetic testing for beneficiaries, without regard to the medical necessity of the prescribed genetic testing;

   3. falsifying and causing the falsification of Provider Enrollment Applications to conceal the beneficial ownership of, and managing control over, the MCNAMARA LABS;

9

4.      submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for genetic testing that was not medically necessary, was procured through the payment of kickbacks and bribes, and was not eligible for Medicare reimbursement, including for services purportedly rendered to beneficiaries located in the Eastern District of Louisiana and elsewhere;

5.      concealing and causing the concealment of the offering, paying, soliciting, and receiving of kickbacks and bribes, the ordering of medically unnecessary genetic testing, and the submission of false and fraudulent claims to Medicare;

6.      receiving and obtaining the reimbursements paid by Medicare based on the false and fraudulent claims submitted; and

7.      diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators and to further the conspiracy.

## C.      **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

1.      **MCNAMARA**, Co-conspirator 1, and others opened the MCNAMARA LABS largely as "shell laboratories," meaning laboratories whose primary purpose was to bill Medicare for expensive genetic testing, but which generally did not perform the tests themselves. Instead, the MCNAMARA LABS referred the specimens collected to other "reference" laboratories that actually performed the tests, and the MCNAMARA LABS billed for the tests performed.

2.      **MCNAMARA**, Co-conspirator 1, and others shifted the billing between the MCNAMARA LABS to evade scrutiny from Medicare and law enforcement.

3.      **MCNAMARA**, Co-conspirator 1, and others concealed **MCNAMARA's** and Co-

10

conspirator 1's ownership and control of the MCNAMARA LABS when enrolling the MCNAMARA LABS with Medicare.

4.    **MCNAMARA**, Co-conspirator 1, and others used BLUE HORIZON and BEYOND MEDICAL to pay illegal kickbacks and bribes in exchange for the referral of doctors' orders and to conceal origination of the funds from Medicare. **MCNAMARA**, Co-conspirator 1, and others disguised the nature and source of these kickbacks and bribes by concealing such payments through sham contracts and otherwise making such payments look like they were for legitimate services.

5.    **MCNAMARA**, Co-conspirator 1, and others caused the submission of false and fraudulent claims to Medicare for genetic testing that was not medically necessary and was procured by the payment of kickbacks and bribes.

### CLARITY

6.    In particular, in or around November 2018, **MCNAMARA** began looking to purchase an independent clinical laboratory in Louisiana.

7.    In or around January 2019, **MCNAMARA** began making payments to purchase CLARITY from prior owners.

8.    Despite **MCNAMARA's** acquisition and beneficial ownership of CLARITY, the Provider Enrollment Application was never updated to show **MCNAMARA's** ownership of, and control over, CLARITY.

9.    CLARITY did not have the capability to conduct CGx testing. Instead, CLARITY was used by **MCNAMARA**, Co-conspirator 1, and others to bill Medicare for CGx testing performed by other laboratories.

10.    **MCNAMARA**, Co-conspirator 1, and others caused the payment of kickbacks and

bribes to purported marketers in exchange for the referral to CLARITY of beneficiaries and doctors' orders for CGx testing.

11.     **MCNAMARA**, Co-conspirator 1, and others contracted with purported marketers, who in turn obtained doctors' orders for genetic testing and DNA specimens through telemarketing call centers, including Call Center 1.   These call centers engaged in aggressive telemarketing campaigns, wherein telemarketers lied to and deceived beneficiaries, hundreds of which were referred to the MCNAMARA LABS for testing.

12.     For example, as **MCNAMARA** knew, Call Center 1 utilized a call script that informed beneficiaries that they "ordered a no-cost cancer test online," that "the Medicare approved lab that will handle your testing sample will be Clarity Diagnostics," and that "[t]his is a new technology that Medicare is willing to pay in order to save lives, but it's ultimately up to you to . . . get the package sent back as soon as possible."

13.     After beneficiaries were solicited to provide their medical information, purported telemedicine doctors were paid to electronically sign off on doctors' orders.   In many cases, these doctors were not the beneficiaries' treating physicians, did not perform consultations with the beneficiaries, and did not follow up with the beneficiaries after the testing was performed.

14.     **MCNAMARA** and others created a "coding framework" for telemedicine doctors to utilize when ordering CGx testing.   They also created a "comprehensive panel" of genes to be tested and billed in order to maximize reimbursements from Medicare.

15.     As **MCNAMARA** knew, purported marketers, rather than medical professionals, would add diagnosis codes to requisitions.   **MCNAMARA** and Co-conspirator 1 specifically encouraged others to add diagnosis codes that would "maximize reimbursement."

16.     **MCNAMARA** received complaints from beneficiaries that they were not treated

by a physician and/or did not receive test results, as well as complaints that the testing was a "scam." Despite these complaints, **MCNAMARA** directed CLARITY to continue billing Medicare for CGx testing.

17.     **MCNAMARA** and others knew that claims were submitted to Medicare by CLARITY without the billing modifier to indicate that other laboratories were actually conducting the CGx testing, in order to ensure that Medicare would pay for the testing.

## MERCURY

18.     From in or around April through August 2019, **MCNAMARA**, Co-conspirator 1, and others also utilized MERCURY to submit claims to Medicare for CGx testing.

19.     Although the purchase agreement for MERCURY was purportedly signed by a family member of **MCNAMARA**, MERCURY was in fact owned and controlled by **MCNAMARA**.

20.     Likewise, in or around July 2019, **MCNAMARA** caused a family member to sign the Medicare Provider Enrollment Application for MERCURY.

21.     **MCNAMARA**, Co-conspirator 1, and others caused the payment of kickbacks and bribes to purported marketers in exchange for the referral of beneficiaries and doctors' orders for CGx testing to MERCURY.

22.     In or around September 2019, MERCURY came under review by Medicare, and in or around October 2019, MECRURY received a notice of suspension of Medicare payments, after which **MCNAMARA** and Co-conspirator 1 ceased billing through MERCURY and shifted their billing to other laboratories.

## OPTEO

23.     In or around September 2019, the former owners of OPTEO sold their interest in

the laboratory to a company owned by Individual 3. The purchase agreement was signed by Individual 2.

24.     In November 2019, OPTEO—located in a nearby office suite in the same building as CLARITY—commenced billing Medicare for CGx testing.

25.     In or around December 2019, Individual 3 signed the Medicare Provider Enrollment Application on behalf of OPTEO. **MCNAMARA** did not disclose his ownership and control over OPTEO.

26.     **MCNAMARA**, Co-conspirator 1, and others contracted with Call Center 2 to solicit beneficiaries for medically unnecessary CGx testing. As **MCNAMARA** knew, Call Center 2 solicited beneficiaries by purchasing the contact information of individuals who completed online surveys regarding their cancer and medical history, often in exchange for gift cards to retailers or restaurants. Beneficiaries were then solicited by phone to agree to undergo medically unnecessary CGx testing. The call center staff sometimes would call a single targeted beneficiary multiple times per day.

27.     As **MCNAMARA** knew, employees of Call Center 2 used a preapproved script, which the callers were instructed to "read verbatim," in which they stated they were calling "on behalf of Opteo Laboratory," referred to themselves as "health advisors" despite having no medical training, and informed beneficiaries that CGx testing was available to them through Medicare.

28.     As **MCNAMARA** knew, Call Center 2 then arranged for telemedicine doctors to sign requisitions for CGx testing.

### SIGNIFY

29.     In addition to utilizing OPTEO to bill Medicare for CGx testing, **MCNAMARA**, Co-conspirator 1, and others used SIGNIFY to bill Medicare for cardio genetic testing.

30.     As with OPTEO, in or around October 2019, Individual 3 signed the Medicare Provider Enrollment Application on behalf of SIGNIFY.  **MCNAMARA** did not disclose his ownership and control over SIGNIFY.

31.     To obtain doctors' orders for cardio genetic testing, SIGNIFY utilized a "doctor chase" model, which involved purported marketing companies faxing or providing the beneficiary's primary care physician with a proposed prescription.  Call centers repeatedly called the doctor's office in an effort to coax the doctor into signing the prescription.

32.     In or around January 2020, **MCNAMARA**, Co-conspirator 1, and others began formulating a requisition form for doctors to order cardio genetic testing.  **MCNAMARA** emailed a list of "Cardio Survey Questions" for call center representatives to ask beneficiaries, such as whether they "ever experience arrhythmia, palpitations or an irregular heart rate."

33.     The "Genetic Cardio Screening Questions" emailed by **MCNAMARA** included questions regarding the beneficiaries' "primary care physician" so that call centers and purported marketing companies could "chase" the orders from beneficiaries' treating physicians.

**<u>Scope of Scheme</u>**

34.     From in or around November 2018, and continuing through in or around July 2020, in the Eastern District of Louisiana, and elsewhere, the defendant caused the MCNAMARA LABS to submit over $174 million in false and fraudulent claims to Medicare for CGx testing and cardio genetic testing that was ineligible for Medicare reimbursement because the testing was not medically necessary and was procured through the payment of illegal kickbacks and bribes.  Of these claims, Medicare reimbursed the MCNAMARA LABS over $55 million.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 – 9
(Health Care Fraud)

### A.    AT ALL TIMES RELEVANT:

The General Allegations Section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

### B.    HEALTH CARE FRAUD:

From in or around November 2018, and continuing through in or around July 2020, in the Eastern of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA**, aiding and abetting others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare.

### C.    PURPOSE OF THE SCHEME:

The Purpose of the Conspiracy section of Count 1 of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

### D.    THE SCHEME AND ARTIFICE

The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as a description of the scheme and artifice.

### E.    ACTS IN EXECUTION OF THE SCHEME:

In order to execute and attempt to execute the scheme to defraud and to obtain money and property, and to accomplish the objects of the scheme, the defendant, **JAMIE P. MCNAMARA**, submitted, caused others to submit, and aided and abetted others in submitting the following false

16

and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary and eligible for Medicare reimbursement, with each execution set forth below forming a separate count:

| Count | Beneficiary | Approx. Claim Date | Lab | Description of Claim | Principal Diagnosis Code | Approx. Amount Billed |
|-------|-------------|--------------------|-----|----------------------|--------------------------|-----------------------|
| 2 | Beneficiary 1 | 6/25/2019 | CLARITY | Gene Analysis; Molecular Pathology Procedure | Encounter For Other Screening For Genetic And Chromosomal Anomalies | $22,674.90 |
| 3 | Beneficiary 2 | 7/11/2019 | CLARITY | Gene Analysis; Molecular Pathology Procedure | Encounter For Nonprocreative Screening For Genetic Disease Carrier Status | $11,443.82 |
| 4 | Beneficiary 3 | 7/11/2019 | MERCURY | Gene Analysis; Molecular Pathology Procedure | Encounter For Other Screening For Genetic And Chromosomal Anomalies | $11,443.82 |
| 5 | Beneficiary 4 | 7/30/2019 | MERCURY | Gene Analysis; Molecular Pathology Procedure | Encounter For Nonprocreative Screening For Genetic Disease Carrier Status | $11,443.82 |
| 6 | Beneficiary 5 | 12/7/2019 | OPTEO | Gene Analysis; Molecular Pathology Procedure | Malignant Neoplasm Of Upper-Outer Quadrant Of Left Female Breast | $6,609.47 |
| 7 | Beneficiary 6 | 1/6/2020 | OPTEO | Gene Analysis; Molecular Pathology Procedure | Malignant Neoplasm Of Lower-Inner Quadrant Of Right Female Breast | $8,231.59 |
| 8 | Beneficiary 7 | 6/8/2020 | SIGNIFY | Gene Analysis; Molecular Pathology Procedure | Chronic Ischemic Heart Disease, Unspecified | $7,454.24 |
| 9 | Beneficiary 8 | 7/7/2020 | SIGNIFY | Gene Analysis; Molecular Pathology Procedure | Cardiomyopathy, Unspecified | $7,454.24 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 10
(Conspiracy to Pay and Receive Health Care Kickbacks)

**C.**    **AT ALL TIMES RELEVANT:**

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

**D.**    **THE CONSPIRACY:**

Beginning in or around November 2018, and continuing through in or around July 2020, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA**, did knowingly and willfully combine, conspire, confederate, and agree with Co-conspirator 1 and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.    to violate Title 42, United States Code, Sections 1320a-7b(b)(2)(A)-(B), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, and to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, services, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare; and

b.    to violate Title 42, United States Code, Sections 1320a-7b(b)(1)(A)-(B), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is,

15

Medicare, and in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

**C.**    **PURPOSE OF THE CONSPIRACY:**

It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves and others by, among other things:

1.    Offering and paying kickbacks and bribes in exchange for the referral of beneficiaries and doctors' orders for genetic testing to the MCNAMARA LABS;

2.    Submitting and causing the submission of claims to Medicare through the MCNAMARA LABS for genetic testing;

3.    Concealing and causing the concealment of the payment of kickbacks and bribes; and

4.    Diverting kickback proceeds for the personal use and benefit of the defendant and his co-conspirators and to further the conspiracy.

**D.**    **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

1.    **MCNAMARA**, Co-conspirator 1, and others offered and paid kickbacks and bribes from the MCNAMARA LABS, through shell companies such as BEYOND MEDICAL and BLUE HORIZON, to purported marketers, call centers, and telemedicine companies, in exchange for referring beneficiaries and doctors' orders for genetic testing, in order to bill Medicare for genetic testing purportedly provided to the beneficiaries.

2. **MCNAMARA**, Co-conspirator 1, and others directed the transfer of funds received from Medicare to Beyond Medical Account, Blue Horizon Accounts 1-3, and other accounts controlled by **MCNAMARA** and/or Co-conspirator 1, and then caused the transfer of funds to the purported marketers, call centers, and telemedicine companies.

3. **MCNAMARA**, Co-conspirator 1, and others negotiated the kickback and bribe agreements, including with Telemedicine Company 1, Call Center 1, and Call Center 2, and disguised the nature and source of the kickbacks and bribes through sham contracts and otherwise concealing such kickbacks and bribes by describing them as payments for legitimate services, such as "marketing" and "account management" services.

4. **MCNAMARA**, Co-conspirator 1, and others paid the marketers either a specific dollar amount per referral of doctors' orders for genetic testing, such as $75 per order, or a percentage of reimbursements from Medicare for the genetic testing billed. For example, **MCNAMARA** and Co-conspirator 1 paid purported marketers approximately 50% of the reimbursements obtained from Medicare by MERCURY in exchange for their referrals. As **MCNAMARA** knew, the purported marketers would, in turn, pay telemedicine doctors to sign doctors' orders for genetic testing.

5. From in or around January 2019 through August 2020, **MCNAMARA**, Co-conspirator 1, and others caused approximately $8.5 million to be paid to Call Center 1 in exchange for referring beneficiaries and doctors' orders for genetic testing.

6. From in or around January 2019 through March 2019, **MCNAMARA**, Co-conspirator 1, and others caused approximately $84,900 to be paid to Telemedicine Company 1 in exchange for referring beneficiaries and doctors' orders for genetic testing.

7.      In total, **MCNAMARA**, Co-conspirator 1, and others caused at least $16.8 million in kickbacks and bribes to be paid in exchange for the referral of beneficiaries and doctors' orders for genetic testing.

8.      **MCNAMARA**, Co-conspirator 1, and others caused the MCNAMARA LABS to submit claims to Medicare for genetic testing that were procured through the payment of kickbacks and bribes.

9.      **MCNAMARA**, Co-conspirator 1, and others used the proceeds received from Medicare to benefit themselves and others and to further the conspiracy.

**E.    OVERT ACTS:**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Eastern District of Louisiana, and elsewhere, at least one of the following overt acts, among others:

On or about January 23, 2019, Co-conspirator 1 emailed the owner of Telemedicine Company 1 regarding wires that **MCNAMARA** "has sent to you so far . . . $45,000 total divided by $75.00 covers 600 patients."

All in violation of Title 18, United States Code, Section 371.

**COUNTS 11 – 12**
(Offering and Paying Health Care Kickbacks)

**A.    AT ALL TIMES RELEVANT:**

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

**B.    OFFERING AND PAYING HEALTH CARE KICKBACKS:**

On or about the dates set forth below, with respect to each count, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA**, did knowingly and willfully

offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and

covertly, in cash and in kind, including by wire transfer, to a person to induce such person to refer

an individual to a person for the furnishing and arranging for the furnishing of any item or service

for which payment may be made in whole or in part under a Federal health care program, that is,

Medicare, and to purchase, lease, order, and arrange for and recommend purchasing, leasing, and

ordering any good, facility, services, and item for which payment may be made in whole or in part

under a Federal health care program, that is, Medicare, as set forth below:

| Count | Approx. Date of Kickback Payment | Approximate Amount | Description |
|-------|----------------------------------|--------------------|-------------|
| 11 | 2/8/2019 | $22,950 | Wire transfer from Beyond Medical Account to Telemedicine Company 1 |
| 12 | 8/1/2019 | $650,000 | Wire transfer from Blue Horizon Account 1 to Call Center 1 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b)(2)

and Title 18, United States Code, Section 2.

## COUNT 13
(Conspiracy to Commit Money Laundering)

**A.    AT ALL TIMES RELEVANT:**

The General Allegations section of this Indictment is re-alleged and incorporated by

reference as if fully set forth herein.

**B.    THE CONSPIRACY:**

Beginning in or around November 2018, and continuing through in or around December

2021, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P.**

**MCNAMARA**, did knowingly and willfully combine, conspire, confederate, and agree with Co-

conspirator 1 and others known and unknown to the Grand Jury, to violate Title 18, United States

Code, Sections 1956 and 1957, that is:

a.       to knowingly conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.       to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and offer and payment of kickbacks and bribes in connection with a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

## C.    **PURPOSE OF THE CONSPIRACY:**

It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves and others, to conceal the receipt and transfer of the proceeds of specified unlawful activity, and to further the specified unlawful activity.

## D.    **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

1.     The MCNAMARA LABS received over $55 million from Medicare for billing for expensive and medically unnecessary genetic testing.  **MCNAMARA** and others then laundered the fraud proceeds through shell companies, which **MCNAMARA** and others controlled.

2.     Co-conspirator 1 orchestrated the creation of numerous companies and bank accounts to be owned and contracts to be signed by the defendant, Individual 1, Individual 2, Individual 3, and others in order to conceal the movement of money.

3.     **MCNAMARA**, Co-conspirator 1, Individual 1, Individual 2, and Individual 3 opened and caused to be opened various bank accounts, including the Clarity Account, Mercury Accounts 1 and 2, Opteo Accounts 1 and 2, and the Signify Account.  These accounts were used to deposit the proceeds obtained from the conspiracy to commit health care fraud and wire fraud.

4.     **MCNAMARA**, Co-conspirator 1, Individual 1, Individual 2, and Individual 3 executed and caused the execution of checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity into bank accounts in the names of the defendant, Co-conspirator 1, Individual 1, Individual 2, and Individual 3, including Beyond Medical Account and Blue Horizon Accounts 1 through 4.

5.     From in or around April 2019 through October 2020, **MCNAMARA** caused the transfer of approximately $24,158,792.08 from accounts associated with the MCNAMARA LABS to Blue Horizon Account 1.

6.     From in or around July 2020 through September 2021, **MCNAMARA** caused the transfer of approximately $7,701,900 from accounts associated with the MCNAMARA LABS or Blue Horizon Account 1 to Blue Horizon Account 2.

7.     Following the transfer of the proceeds of the above-mentioned specified unlawful activity, the defendant and others transferred and caused transfers constituting proceeds derived

from the above-mentioned specified unlawful activity: (a) into bank accounts controlled by co-conspirators; (b) into investment accounts controlled by co-conspirators; and (c) for purchases of real estate, luxury vehicles, a boat, and other personal expenditures exceeding $10,000.

8.     Following the transfer of the proceeds of the above-mentioned specified unlawful activity, co-conspirators transferred the proceeds to purported telemedicine companies, which in turn compensated medical providers for signing orders for genetic testing.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 14-15
### (Money Laundering)

**A.     AT ALL TIMES RELEVANT:**

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

**B.     MONEY LAUNDERING:**

On or about the dates specified below as to each count, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA**, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity:

| Count | Approx. Date of Transaction | Description |
|---|---|---|
| 14 | 8/20/2019 | Wire of approximately $442,403.35 from Blue Horizon Account 1 for the purchase of a home in Greenwood, Missouri |

| 15 | 12/23/2021 | Wire of approximately $539,505.92 from Blue Horizon Account 3 to Blue Horizon Account 4 |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and offer and payment of kickbacks and bribes in connection with a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

Each of the above is a violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS 16-18
(Money Laundering)

### A.   AT ALL TIMES RELEVANT:

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

### B.   MONEY LAUNDERING:

On or about the dates specified below as to each count, in the Eastern District of Louisiana, and elsewhere, the defendant, **JAMIE P. MCNAMARA,** did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Count | Approx. Date of Transaction | Description |
|-------|-----------------------------|-------------|
| 16 | 2/11/2020 | Purchase of cashier's check in the approximate amount of $183,990.86 from Bluebird Account for the purchase of a Land Rover |

| 17 | 4/29/2020 | Purchase of cashier's check in the approximate amount of $980,000 from Bluebird Account and deposited into Blue Horizon Account 3 |
| 18 | 7/31/2020 | Wire of approximately $1,377,572.48 from Blue Horizon Account 2 for the purchase of a home in Kansas City, Missouri |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and offer and payment of kickbacks and bribes in connection with a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

Each of the above is a violation of Title 18, United States Code, Sections 1957(a) and 2.

## NOTICE OF FORFEITURE

1.     The allegations of Counts 1 through 18 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.     As a result of the offense alleged in Count 1, the defendant, **JAMIE P. MCNAMARA**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offense.

3.     As a result of the offenses in Counts 2 through 12, the defendant, **JAMIE P. MCNAMARA**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of said offenses.

4.     As a result of the offenses in Counts 13 through 18, the defendant, **JAMIE P. MCNAMARA**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to

such property.

5.      The property to be forfeited includes, but is not limited to, the following:

Approximately $6,837,763.75 in United States currency, seized from account number x9619, held at Bank 7;

Approximately $213,325.33 in United States currency, seized from account number x3830, held at Bank 2;

One (1) 2020 Ford F-150, Vehicle Identification Number 1FTEW1E59LKD38858;

One (1) 2020 Land Rover Range Rover, Vehicle Identification Number SALGV5SE8LA597685;

One (1) 2019 BMW, Vehicle Identification Number 5UXCX4C55KLS39258;

One (1) 2020 Tesla Model X, Vehicle Identification Number 5YJXCDE42LF233909;

One (1) 2021 Nor-Tech Yacht, Model 450, Hull Number AOV45027D021;

The residential real property located at 1610 SW Arbor Mist Drive, Lee's Summit, Missouri;

The residential real property located at 5245 Ward Parkway, Kansas, Missouri; and

The residential real property located at 529 South Shore Drive, Lake Winnebago, Missouri.

6.      If any of the above-described property, as a result of any act or omission of the

defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

**A TRUE BILL:**



DUANE A. EVANS
UNITED STATES ATTORNEY

NICHOLAS MOSES
Assistant United States Attorney

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

(for JW)

JUSTIN M. WOODARD
Assistant Chief
Criminal Division, Fraud Section
United States Department of Justice

KEILY Z. WALTERS
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

New Orleans, Louisiana
July 14, 2022

29

FORM OBD-34

No.___

## UNITED STATES DISTRICT COURT

Eastern ___ District of ___ Louisiana

___ Criminal ___ Division

## THE UNITED STATES OF AMERICA

vs.

## JAMIE P. MCNAMARA

## INDICTMENT

INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD, HEALTH CARE FRAUD, CONSPIRACY TO PAY AND RECEIVE KICKBACKS, OFFERING AND PAYING KICKBACKS, CONSPIRACY TO COMMIT MONEY LAUNDERING, AND MONEY LAUNDERING

### VIOLATIONS:

18 U.S.C. §§ 1349, 1347, 371, 1956(h), 1956(a)(1)(B)(i), 1957(a), and 2

42 U.S.C. § 1320a-7b(b)(2)

A true bill.

_____

Foreperson

Filed in open court this ___ day of ___ A.D. 2022.

_____
Clerk

Bail, $ ___

_____
(NICHOLAS D. MOSES
Assistant United States Attorney